## TOLEDO REX SPRAY CO. v. CALIFORNIA SPRAY CHEMICAL CO.

(Circuit Court of Appeals, Sixth Circuit. October 14, 1920.)

No. 3408.

1. **Patents 328—892,603, for process for making arsenate of lead, not void for lack of invention.**
   Luther & Volck patent, No. 892,603, for a process for making arsenate of lead, *held* not void for lack of invention.

2. **Patents 328—892,603, for method of preparing arsenate of lead, sufficiently disclosed process.**
   Luther & Volck patent, No. 892,603, for a process for making arsenate of lead, *held* to sufficiently disclose the process involved, although the patent does not state at what stage the catalyzer is added.

3. **Patents 328—892,603, for process for making arsenate of lead, infringed.**
   Luther & Volck patent, No. 892,603, for a process for making arsenate of lead, *held* infringed by process using the same formula although defendant made only pyro-arsenate, while plaintiff made its ortho-arsenate product more prominent than its pyro-arsenate.

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Suit by the California Spray Chemical Company against the Toledo Rex Spray Company. Decree for plaintiff, and defendant appeals. Affirmed.

W. H. Swenarton, of New York City, and Russell Wiles, of Chicago, Ill. (W. H. Swenarton, of New York City, and Russell Wiles, of Chicago, Ill., on the briefs), for appellant.

Livingston Gifford, of New York City (Livingston Gifford and C. G. Heylmun, both of New York City, and Wilber Owen, of Toledo, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. This suit is upon patent No. 892,603, July 7, 1908, to Luther & Volck upon a process of making arsenate of lead, which is carried out, according to the specification, by combining lead oxide (litharge) suspended in water and arsenic acid in solution; the reaction being assisted by the cyclic action of the catalyzing agent— either acetic acid or nitric acid. The specification gives the formula of combining weights of lead oxide and arsenic acid, respectively, as varying from 1.938 to 2.9 parts of the lead oxide to one part of arsenic acid, according as ortho-arsenate or pyro-arsenate is desired. As shown by the specification, the weaker acid solution—practically three parts of lead oxide and one part of arsenic acid—produces the ortho-arsenate "with traces of pyro-arsenate of lead, lead salts of the catalyzer, and the catalyzer." The stronger acid solution (practically two parts of lead oxide and one part of arsenic acid) produces pyro-arsenate, "with traces of ortho-arsenate of lead, lead salts of the catalyzer, and the

catalyzer." A varying of these proportions produces a corresponding variation in the acidity of the product. The preferable proportion of the catalyzing agent is given as "one to three pounds of the catalyzer to one hundred pounds of the lead oxide." The only claim is as follows:

"The process of making arsenate of lead, which consists in reacting upon lead oxide held in suspension in water with arsenic acid in the presence of a catalytic agent; the lead oxide and arsenic acid being used in the proportion of their combining weights."

The defenses are invalidity and noninfringement. This appeal is from an interlocutory decree finding the patent valid and infringed. The grounds of asserted invalidity are (1) lack of invention in view of the prior art, especially if the patent is construed broadly enough to cover defendant's process; (2) lack of sufficient disclosure.

[1] 1. *Invention.*—Many years previous to Luther & Volck's patent application (July 10, 1907) standard chemical authorities had taught that arsenate of lead could be obtained by the action of arsenic acid on nitrate of lead, by direct precipitation. Previous to the application for the patent in suit, the usual, if not the only, commercial method of making arsenate of lead was by combining either acetate of lead or nitrate of lead with arsenate of soda; the products of the respective reactions consisting of arsenate of lead, together with acetate or nitrate of soda, according as acetate or nitrate of lead was used. In neither the general teaching of the chemical authorities referred to nor in the double decomposition process was there any catalytic or cyclic action involved. Bell & Fell, however, had, in 1866, been granted a patent (No. 59,901) for an improvement in the manufacture of white lead, by which sulphate of lead was produced by the direct action of nitric acid upon lead oxide (thus forming nitrate of lead), to which product was added sulphuric acid and water, resulting in a lead sulphate. In this process (designed for use in the paint art) the nitric acid acted as a catalyst; that is to say, as an agent or auxiliary in liberating, from time to time, portions of the oxide of lead and converting the same into lead nitrate, which, by the action of the sulphuric acid, are immediately converted into lead sulphate—the constant repetition of this process until the whole mass of lead oxide is converted into lead sulphate, constituting the so-called cyclic action. The Bell & Fell specification also states that acetic acid may be used in place of nitric acid. The patent contains a formula fully as specific and definite as that of the patent in suit, if not more so.

The presence or absence of invention in the patent in suit thus depends upon whether, at the time of Luther & Volck's application, it was within the expected skill of the chemist, knowing, first, that lead nitrate would react with arsenic acid to produce lead arsenate, and, second, that the Bell & Fell process converted lead oxide into sulphate of lead by the use of nitric acid as a catalyzer—to further know that arsenate of lead could be produced instead of sulphate by substituting arsenic acid for Bell & Fell's sulphuric acid. At first blush, and without further statement of facts, the presence of invention in the Luther

& Volck patent would seem doubtful. But further facts must be taken into account.

While arsenate of lead has long been used in the paint and dye arts, in combination with other substances, its sole use, uncombined, seems to be and to have been as an insecticide. In 1890, it had been used with good results in combating the gypsy moth. The insecticide art, however, involves not only chemistry, but entomology; the live problem being to obtain a product such as will cover the foliage and fruit, and so result in killing the insect, without killing or injuring either fruit or foliage. Climatic conditions and the degree of sensitiveness of both fruit and foliage are necessarily involved. The invention of the patent in suit owes its birth to a campaign for the extermination of the coddling moth in the Watsonville district of California, beginning in the year 1903, and carried on by the patentees, the one as a laboratory assistant in the Department of Entomology in the University of California, the other as a student in agricultural chemistry in the same institution, and under the supervision of the professor of entomology therein, under conditions of such obstinacy as to convince that department that the reputation of the university was directly at stake.

In the district in question, which was foggy, not only had orchards previously been injured by the use of paris green (arsenite of copper), as well as by arsenate of lime, which had killed the fruit, but it was found, during the campaign in question, that while certain commercial samples of arsenate of lead at first seemed effective, others caused serious burnings, due to the variability and unreliability of the double decomposition products of the lead arsenate, resulting from inability to control the degree of acidity in the product or satisfactorily to eliminate impurities and by-products, as well as the presence of mediums, such as large quantities of soda, interfering with complete reaction. The direct combination of arsenic acid and lead oxide was found slow and impracticable. Exhaustive experiments were accordingly made by the inventors in the actual manufacture of lead arsenate, with the aid of formulas given in bulletins of the universities and other available sources, and with the design of overcoming the obstacles presented. The adoption of nitric acid and acetic acid as catalyzers to control the proportion of acid content resulted and solved the problem; the coddling moth being within a few years thereafter completely controlled.

The invention was followed by the inauguration in 1907 of a factory at Watsonville for the manufacture upon a large scale of arsenate of lead in accordance with the formula of the patent. The process of the patent is shown to have substantial advantages over the process of the prior art; its new and specially distinguishing feature being the ability to control more positively and more readily the character of the arsenate (whether ortho or pyro), including the percentage of acidity. We are also convinced by the testimony that the process of the patent more readily and effectively produces superiority of product as respects smoothness, distribution, and adhesiveness. The double decomposition process has been very largely superseded by the process of the

patent in suit, although as late as 1913 one of the prominent paint manufacturers of the country still made some arsenate of lead by the double decomposition process. The manufacture of lead arsenate at the Watsonville factory has increased from about 20,000 pounds in 1907 to about 400,000 pounds in 1918. Beginning with March, 1916, licenses under the patent were issued to the two largest chemical corporations, a large drug manufacturer (perhaps the largest), the largest dry color manufacturer, one of the largest paint manufacturers, and one of the largest insecticide manufacturers in the United States—all, except one company, operating upon substantial royalties, the remaining company paying an outright consideration of $30,000, with royalties besides, in case of successful adjudication of the patent. The manufacture by these licensees under the patent aggregated in 1918 more (apparently considerably more) than 5,000,000 pounds.

While in the light of the invention of the patent it may seem that it would naturally have occurred to one acquainted with the Bell & Fell disclosure to have tried the substitution of arsenic acid for sulphuric acid in making arsenate of lead, the fact remains that in the 40 years which elapsed since Bell & Fell it seems to have occurred to no one to try that experiment. In the light of this fact, and the further fact that mere analogy is not, in chemistry, usually so certain an index as in mechanics (Naylor v. Alsop Process Co. [C. C. A. 8] 168 Fed. 911, 919, 94 C. C. A. 315; General Electric Co. v. Laco-Philips Co. [C. C. A. 2] 233 Fed. 96, 103, 147 C. C. A. 166), we are not satisfied to say that it was within the expected skill of the chemist to know that Bell & Fell's process of making sulphate of lead (which may or may not have been employed commercially), was equally available for producing arsenate of lead by the mere substitution of arsenic acid for sulphuric acid. We agree, also, with Judge Killits that in this case the evidence of favorable public reception and commercial success, in connection with the history of the working out of the invention, removed whatever doubt might otherwise exist as to invention. We think the case clearly within the doctrine applied in Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 270 (37 Sup. Ct. 82, 61 L. Ed. 286), and the authorities cited on the latter page.

2. *The Disclosure.*—The objections on this score are: (a) Failure to disclose by the patent that the product of the invention was intended as an insecticide, and that the fine, fluffy product, such as the process of the patent is shown to produce, is desired or even producible by the process of the patent; and (b) lack of sufficient information to enable one skilled in the art to practice it. The first objection impresses us as so plainly without merit as to require no discussion.

[2] *As to the Second Objection:* We are convinced from the testimony that the disclosure is sufficient to enable one skilled in the art to practice the invention. It is true that conditions of temperature, quality of the ingredients used, and perhaps other elements, require care and to some extent experimentation to produce the best results. But the disclosure is addressed to those skilled in chemistry (Minerals Separation, Ltd., v. Hyde, supra, 242 U. S. at pages 270, 271, 37 Sup. Ct. 82,

61 L. Ed. 286), and we are impressed by what seems to us the greater weight of the evidence that the disclosure is ample for those so skilled.

In this connection it is urged that it does not appear from the patent at what stage the catalyzer is to be added, and it is contended that if it be added last—that is, after the arsenic acid—the process of the patent cannot be effectively carried out. In our judgment, this objection is not sound. It is true that the claim does not state the order in which the catalyzer is to be added, and that the first part of the specification does not in so many words say that it is added after the introduction of the arsenic acid, although that seems the more reasonable construction. But the more natural deduction from the formula later given is that the catalyzer is to be introduced before the arsenic acid is added. This being so, it would not seem highly important whether or not the process of the patent could be effectively carried out by adding the catalyzer as the last element. But notwithstanding defendant's evidence, and the experiment designed to support it, that the catalyzer must be added before the arsenic acid in order to success, the testimony of plaintiff's expert, in connection with his experiments, shows satisfactorily to our minds that successful working out of the process can be had, even by adding the catalyzer last, although that is not the preferable or desirable method.

[3] 3. *Infringement.*—We think the testimony clearly shows that the defendant's process infringes the patent as we have construed it. It employs 2.2 parts of lead oxide to one part of arsenic acid, being thus between the minimum and maximum of the patent, and it employs 2.81 per cent. of nitric acid as a catalyzer, which is between the minimum of 1 and the maximum of 3 per cent. specified in the patent. It is not, to our minds, important that defendant makes only a pyro-arsenate, or that plaintiff uses the word "ortho" as a trade-mark, making its ortho-arsenate product more prominent than its pyro-arsenate. It is enough that defendant uses the precise formula of the patent.

The decree of the District Court should be affirmed.