**ROHM & HAAS COMPANY, a corporation, Plaintiff,**

v.

**ROBERTS CHEMICALS, Inc., a corporation, Defendant.**

**Civ. A. No. 1632.**

United States District Court
S. D. West Virginia.

June 27, 1956.

Connolly, Cooch & Bove, Arthur G. Connolly, Wilmington, Del., Jackson Kelly, Holt & O'Farrell, William J. Carter, Charleston, W. Va., for plaintiff.

Stevens, Davis, Miller & Mosher, Robert F. Davis, Martin Fleit, Washington, D. C., John B. Fisher, Charleston, W. Va., for defendant.

MOORE, Chief Judge.

Plaintiff claims that defendant is a contributory infringer as well as a direct infringer of plaintiff's patent number 23,742, wherein plaintiff claimed in seven separate claims the process of controlling fungus growth on living plants by applying thereto fungicidal compositions having as an active ingredient various salts of ethylene bisdithiocarbamic acid. This process patent is a reissue of patent number 2,317,765, whereby plaintiff's assignor, one William F. Hester, was granted exclusive rights relating to certain of these fungicidal compositions themselves. No process claims were included in this original patent. The reissue patent, however, contains eight process claims, some of which coincide as to the description of the active ingredient with the claims of the original patent, while others do not. Thus, the reissue patent contains process claims covering the zinc, cadmium and "bivalent metal" salts of ethylene bisdithiocarbamic acid, none of which are mentioned or set out in the claims of the original patent; and further, a process claim of the reissue patent covers the sodium salt, whereas the corresponding composition claim in the original patent speaks of the disodium salt.[1]

The particular chemical compound which rests at the basis of the controversy is a substance familiarly known as nabam. This is the sodium salt of ethylene bisdithiocarbamic acid.

Defendant is a manufacturer of chemicals, whose plant is located at Nitro, West Virginia. It was organized in the year 1953 for the purpose of manufacturing and selling various chemical compounds, among which was nabam. This compound was by that time known to be in widespread use by farmers as an ingredient of a fungicide prepared by diluting the nabam with water in the pro-

---

1. The claims of the respective patents were as follows:

*Claims of the original Hester patent:*

1. A fungicidal composition having as an active ingredient a salt of an alkylene bisdithiocarbamic acid.

2. A fungicidal composition having as an active ingredient a salt of ethylene bisdithiocarbamic acid.

3. A fungicidal composition having as an active ingredient the disodium salt of ethylene bisdithiocarbamic acid.

4. A fungicidal composition having as an active ingredient the cupric salt of ethylene bisdithiocarbamic acid.

5. A fungicidal composition having as an active ingredient the ferric salt of ethylene bisdithiocarbamic acid.

*Claims of Hester reissue patent:*

The same composition claims were applied for, but denied, and only process claims allowed, as follows:

6. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a salt of an alkylene bisdithiocarbamic acid.

7. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a salt of ethylene bisdithiocarbamic acid.

8. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a bivalent metal salt of ethylene bisdithiocarbamic acid.

9. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the sodium salt of ethylene bisdithiocarbamic acid.

10. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the cupric salt of ethylene bisdithiocarbamic acid.

11. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the ferric salt of ethylene bisdithiocarbamic acid.

12. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the zinc salt of ethylene bisdithiocarbamic acid.

13. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the cadmium salt of ethylene bisdithiocarbamic acid.

portion of approximately one-tenth of one per cent of the active ingredient and ninety-nine and nine-tenths per cent of water and applying it to the living plant; or by dispersing it in approximately similar proportion in some inert powder or earthy medium, and thus applying it to the living plant. Only a negligible amount of nabam had been manufactured by defendant prior to the date of plaintiff's reissue patent; but since that date defendant has, through distributors and dealers, placed in the hands of farmers substantial quantities of this product, together with detailed instructions regarding its use on living plants, similar in all material respects to the instructions furnished to farmers by plaintiff in connection with the sale of the same product. It is this activity on the part of defendant which plaintiff seeks to enjoin as an infringement of its reissue patent, and for which it also seeks to recover damages in this case.

Defendant has filed a counterclaim asking for a declaratory judgment to the effect that plaintiff's reissue patent is invalid, and also for an injunction to restrain further suits against it for infringement by plaintiff.

The chemical compound called nabam was not unknown when Hester secured his composition patent in the year 1943. Some thirty years before that date one Nagele published the results of an experiment which, about 27 years later, was repeated by a scientist named Yakubovich. This experiment produced the sodium salt of ethylene bisdithiocarbamic acid.

In the year 1934, and thus prior to Yakubovich's experiment, Tisdale and Williams, chemists for E. I. duPont de-Nemours & Co., secured patent number 1,972,961, containing claims to "a disinfectant useful as a bactericide, microbicide, and fungicide, comprising a derivative of dithiocarbamic acid." The Tisdale patent disclosed that all the compounds used by him in performing his experiments contained a grouping of chemical elements designated as $\begin{smallmatrix} & \\ > \end{smallmatrix}N-\underset{\underset{S}{\|}}{C}-S-$, and that "all compounds which contain this characteristic group are of value for the control of fungi of various kinds." The compound known as nabam contains this characteristic group.

It is contended by defendant that because the basic chemical compound, nabam, was discovered by Nagele and confirmed by Yakubovich prior to the Hester composition patent, and because of the disclosure by Tisdale in 1934 that all compounds (including by extension nabam) containing the characteristic grouping of chemical elements above set out are of value for the control of fungi of various kinds, and because of the fact that the "compositions" claimed in the original Hester patent consisted merely of the combinations of nabam, or other salts of ethylene bisdithiocarbamic acid, with plain water; that there was therefore nothing new in the disclosures or claims of the original Hester patent, nor any basis on which could be founded a valid reissue of that patent. Defendant also contends (but this is disputed in the evidence) that routine chemical reactions obtained by experienced chemists in following the teachings of the Tisdale patent will produce substantial quantities of nabam itself. Defendant also claims to have acquired intervening rights which should be protected by the Court; that the reissue of the original Hester patent was invalid because (a) plaintiff was guilty of laches in applying for the reissue; (b) plaintiff lacked sufficient grounds for applying for the reissue because, as defendant contends, the omission of the process claims from the original patent was not due to inadvertence, accident or mistake; (c) because the reissue, if proper at all, should have been applied for within 2 years, and (d) because it is not, as defendant contends, within itself a valid reissue.

There was long need among farmers for a fungicide which would perform

satisfactorily under actual crop conditions. Many different chemicals were tried, but none were found which would kill the fungus without in some way damaging or destroying the plant itself. The problem was to develop a material whose fungicidal properties would be at their maximum efficiency at the same time that its phytotoxicity (state of being poisonous to plants) was at a minimum. Nabam was the first of the fungicides to possess these properties in a satisfactory measure.

However, the use of nabam as a fungicide was originally not without its difficulties. When combined only with water or other inert medium it proved in large degree unstable, and to that extent unreliable and ineffective. Though it was found superior to fungicides theretofore used, it was not until one of plaintiff's chemists, Heuberger, in the year 1943, had discovered that by combining nabam with zinc sulfate and lime and then diluting this combination, a better degree of stability could be attained, and plaintiff had secured a composition patent on this combination that the sale and use of nabam as a fungicide began and grew rapidly.

About the year 1947, E. I. duPont de-Nemours & Co. began to manufacture and sell for use by farmers as a fungicide a product which, under another name, was substantially the same as nabam. This was continued for several years, during which time plaintiff did not seek to prevent duPont (as it is now seeking to prevent defendant) from making and selling this product. It was explained by one of plaintiff's representatives who testified as a witness that the reason why no steps were taken against duPont was that plaintiff feared it might be deemed guilty of misuse of its patent, in view of the claims of the Hester patent to "fungicidal" compositions, duPont having been marketing the product in a highly concentrated form which was not a practical fungicide for living plants until greatly diluted, and hence could not be used as such without destroying the living plants. Prior to the bringing of this suit plaintiff had granted duPont a license for the use of the process claims in the reissue patent.

Defendant has sold nabam primarily to two distributors, namely, Diamond Fertilizer Company and Chemical Formulators, Inc. These companies have acted as distributors under indemnity agreements with defendant protecting them against claims of infringement.

Defendant in its answer sets up the defense that nabam is a staple article of commerce, suitable for uses other than those claimed in the Hester reissue patent. Little if any evidence was offered in proof of this defense, and I therefore find as a virtually undisputed fact that the only present commercial use of nabam is as a fungicide, to be used in some form of dilution, or in combination with other chemicals, on living plants.

The method used by Hester in learning about the fungicidal propreties of nabam in its relation to living plants was as follows:

One Dr. Horsfall was, at the time of Hester's investigations, in charge of a plant experimental station in Connecticut. At this place he performed experiments on living plants with various substances as they were furnished to him by persons wishing to have materials tested. Hester, during a period of approximately three years around 1940, took from the shelves of the Rohm & Haas laboratory approximately thirteen hundred different materials or substances, which he sent to Dr. Horsfall for the purpose of having them tested as to their fungicidal properties on living plants. Among these was a sample of nabam. The first report on nabam made by Dr. Horsfall was that it was unsatisfactory. For some reason not explained in the evidence (Hester being deceased and therefore unavailable as a witness) Hester did not discard the possibility of using nabam but, presumably on the theory that the sample sent was an old sample and might have deteriorated, he sent a new sample of nabam which, when experimented with by Dr. Horsfall, proved

so effective that Hester proceeded to obtain his original composition patent.

John F. Bergin, who testified as a witness was, in the year 1943, and had been since 1935, the person in charge for plaintiff of preparing and submitting applications for patents to the U. S. Patent Office. Hester being also an employee of plaintiff, the application for the original Hester patent was prepared under the supervision of Bergin. Many other patent applications, including those for insecticides and fungicides, were also prepared under Bergin's supervision about the time of the Hester application. Some of these applications contained process claims in addition to composition claims; others did not.

Bergin testified that it was not until the passage by Congress of the 1952 Amendment of the Patent Laws, 35 U.S. C.A. § 1 et seq., that he became conscious of the fact that in preparing the application for the original Hester patent no process claims had been included, or that the original Hester patent, under which plaintiff's large business in plant fungicides had been built up, contained no process claims. He explained that when he noticed in the Patent Act of 1952 that a new use of an old material could be claimed in a process patent it caused him to conclude that if process claims were added to the original patent they would strengthen it "by having claims in the patent which conformed to the statement in the Act that a process covers a new use of a known material." Later on he said that it was the provision of the Patent Act of 1952 relative to misuse of patents that caused him to become conscious of the omission of process claims from the original Hester patent.

I am compelled to find from the evidence on this point, both circumstantial and direct, that plaintiff's agent Bergin, when he filed the application for the original Hester patent and when that patent was issued, as well as at all times during the years intervening between then and 1952, knew all the material facts in connection with the original Hester patent, including the fact that it contained no process claims; but that he in 1952 deemed that he had made an error of judgment in failing to include process claims in the original application, as he believed he had the right to do.

Throughout the trial of this case a great part of the testimony on both sides is devoted to the question of whether or not the original Hester patent, claiming fungicidal compositions having as active ingredients certain salts of ethylene bisdithiocarbamic acid, among which is nabam, was anticipated by the disclosures of the Tisdale patent together with the discoveries of Nagele and Yakubovich. Bearing in mind that plaintiff does not assert that nabam as a chemical was discovered by Hester, but only that Hester was the first to discover its properties as an ingredient of a fungicide; it becomes important to determine whether such qualities of nabam are disclosed in the Tisdale patent.

The discoveries made by Tisdale and claimed by him in his patent were intended to be used primarily in the field of disinfectants, although, as hereinbefore set out, the specifications described and the claims mentioned that Tisdale's discoveries are useful as bactericides, microbicides and fungicides. They purport to cover derivatives of dithiocarbamic acid; but if the sodium salt of bisdithiocarbamic acid is routinely obtainable by the use of reactions described by Tisdale, then, since Tisdale ascribes fungicidal properties to the products of all such reactions, obviously Tisdale's disclosure of nabam as a fungicide ante-dated and therefore anticipated Hester's patent.

 I find from the evidence of the experts who testified on both sides of this case that while Tisdale was not seeking to obtain nabam by the reactions which he describes, yet an experienced chemist skilled in the art would, by following the teachings of Tisdale, obtain by the use of certain chemical reactions described by Tisdale a substantial quantity of the sodium salt of ethylene bisdithiocarbamic acid, which is nabam. It follows therefore that the properties of nabam as a fungicide did not constitute discovery or

invention by Hester but had been at the date of the Hester patent disclosed to the public. See 35 U.S.C.A. § 103. As stated by the Supreme Court in Mandel Bros. v. Wallace, 1948, 335 U.S. 291, 69 S.Ct. 73, 75, 93 L.Ed. 12, "'* * * skillful experiments in a laboratory, in cases where the principles of the investigations are well known, and the achievement of the desired end requires routine work rather than imagination, do not involve invention.'"

Plaintiff contends [citing several cases, among which are: Minerals Separation, Limited v. Hyde, 1916, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; Eibel Process Co. v. Minnesota Paper Co., 1923, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523], that the commercial success of Hester's fungicidal composition strongly indicates its patentability. These cases are of doubtful applicability. Plaintiff did not succeed in marketing any composition containing nabam until, beginning in 1944, "nabam was commercialized in combination with zinc sulfate and hydrated lime and later with zinc sulfate alone," as testified by plaintiff's witness Maughan. Its use in this combination was due to Heuberger's experiments in 1944, and not to the Hester patent alone. In view of Maughan's statement, plaintiff's argument that successful commercialization connotes patentability is not persuasive.

■ Hester, in his original patent claimed compositions having as an active ingredient certain salts of ethylene bisdithiocarbamic acid. It is nowhere stated what materials are to be used other than these salts to form the composition; but the evidence in this case reveals that nothing else is to be used except water. In other words, nabam being a known chemical compound and its fungicidal properties being likewise known, Hester sought to patent a composition consisting of a known chemical compound in combination with water. The only result of such a combination was to dilute the active ingredient so that its fungicidal effect and phytotoxicity decreased in proportion to the amount of water added. In full strength and even with mild dilution it is fatal to plant life; but when further diluted it becomes at a certain stage weak enough so that while killing the fungus it does little damage, if any, to the plant. I am of opinion that no element of invention or discovery which is patentable is found in this process. "The mere addition of water to dilute a known chemical solution does not entitle one to a patent monopoly, at least unless a definite dilution point or range is discovered corresponding to a physical phenomenon." Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 65 S.Ct. 647, 651, 89 L.Ed. 973. Actually, when Hester sent his samples to Horsfall for testing, he did not give any directions with reference to the degree of dilution, but such dilution was done routinely and by standard methods by Horsfall, and in this way the point was ascertained at which the fungicide would be practical and effective.

Since there was no basis for a valid claim by Hester to a composition patent, then, in the absence of some novelty in the method of applying the composition as a fungicide to the living plants there could be no valid process claims growing out of the same specifications. Mixing with water is not a novel method of application.

Even if a composition consisting of the mixing of nabam, a known fungicidal compound, with water, or the process of applying such a composition to living plants when so mixed, were patentable, an essential element of the claim would be the proportionate quantity of water and nabam used in the composition. This conclusion is clearly demonstrated by the fact that although it was shown in evidence that duPont had marketed a similar compound in a nineteen per cent solution in water, plaintiff's officers did not consider this to be a fungicidal composition, in view of the fact that to be safe for plants a dilution containing only about one-tenth of one per cent in water is required. In Hall Laboratories v.

Economics Laboratories, 8 Cir., 1948, 169 F.2d 65, 67, the patent claims in issue read:

Claim 28: " 'A washing composition comprising an alkali-metal metaphosphate which is water soluble and capable of sequestering calcium in a but slightly ionized condition and a deflocculative detergent capable of peptizing greases.' "

Claim 10: " 'A washing composition for cleansing greasy articles, containing an alkali-metal saponifying detergent and sodium hexametaphosphate, the alkali-metal saponifying detergent being in amount sufficient to produce in aqueous solution a highly alkaline solution having a pH value of at least 10.5, the sodium hexametaphosphate, being in amount sufficient to prevent the precipitation of calcium soap in the washing of greasy articles in such highly alkaline solution.' "

The Court, finding the claims invalid because of insufficient description, said, "Under [claim] 28 there must be the right kind and enough of a metaphosphate to be water soluble and capable of the stated sequestration of calcium, and under [claim] 10 enough of the sodium hexametaphosphate to function in one circumstance and then enough to function in another, and there is no specification of proportions identifying the claims with a particular new composition. Therefore a given composition can not be established as infringing either claim 10 or claim 28 without resorting to a performance in use test because in each the product is described in terms of functions."

Moreover, the claims of the Hester patents do not even mention water or any other inert ingredient; whereas the presence of one of these is admittedly essential to the usefulness of the composition as a fungicide.

■ Prior to the passage of the 1952 Amendment of the Patent Act, the question of an inventor's laches in seeking a reissue of a patent was often considered by the courts. The consensus of authority was to the effect that if the application for a reissue contained claims which enlarged the scope of the claims in the original patent the reissue would be denied or held invalid for laches in applying therefor if the inventor failed to make such application within two years from the date of the original patent. Topliff v. Topliff, 1892, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658; Sontag Chain Stores Co. v. National Nut Co., 1940, 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204. If the claims in the application for the reissue narrowed the scope of the original patent, a longer period of delay was permitted, but nevertheless even in such applications the reissue was held invalid when the delay was deemed to be unreasonable. General Radio Co. v. Allen B. DuMont Laboratories, 3 Cir., 1942, 129 F.2d 608.

The 1952 amendment codified what had already been the holding of the courts in this regard, and it is clearly specified in the 1952 amendment, Section 4 of 1952 Patent Act, printed as notes preceding Section 1 of Title 35, U.S.C.A., that it applies to patents already issued as well as those to be issued.

■■ I am of opinion that the claims set out in the reissue of the Hester patent do enlarge the scope of the original patent. I am not qualified to decide in the absence of evidence at the trial (and none was given) whether or not certain of the claims in the reissue patent deal with entirely different subject matter from that of the original patent, in view of the process claim covering sodium salt instead of disodium salt, as in the original patent, and the two claims of the reissue patent covering zinc salt and cadmium salt, neither of which was mentioned in the claims of the original patent. Only a chemist could say whether or not all of these salts are included in the generic term, "a salt of alkylene bisdithiocarbamic acid," but one need not be expert in the field of chemistry, I think, to conclude that the scope of a claim to a fungicidal composition is necessarily enlarged by a subsequent claim to the process of applying this composition to living plants.

Reissues are permitted by the statute only when the patentee in the original patent has claimed more or less than he had a right to claim. 35 U.S.C.A. § 251. No reissue is authorized which does not either narrow or enlarge the scope of the original claims. Now plaintiff does not contend in this proceeding that Hester claimed more in the original patent than he had a right to claim. Its position is that by the specifications of the original patent both composition claims and process claims could have been sustained; and this position is inconsistent with any other view than that Hester claimed less in the original patent than he had a right to claim. It is my construction of the statute that the reference to enlargement of the scope of the claims is directed to patents wherein the patentee has claimed less in the original patent than he had a right to claim. So, from plaintiff's own contentions, it follows that the reissue containing process claims which, plaintiff says, Hester could have claimed in the original application, necessarily enlarges the scope of the claims of the original patent. Since this is so, the right to a reissue was barred by laches prior to the passage of the 1952 amendment, and by express words of the statute thereafter.

The dilemma which plaintiff faces is apparent. If Hester had the right to claim originally both the compositions and the processes, then the later claims to processes, after failure to claim them originally, is obviously an enlargement in scope. On the other hand, any conclusion that the scope of the claims is narrowed must necessarily be based on the concession that the original composition claims included by implication process claims, but that the composition claims as such were invalid; and this concession plaintiff strenuously declines to make; for, if it did so, its sole claim to originality with reference to the process patent would be the degree of dilution to which the compound known as nabam (or the other named salts of ethylene bisdithiocarbamic acid) is subjected in order to function as a practical fungicide.

Moreover, if the scope of the claims of the original patent were not enlarged, the circumstances compel the conclusion that plaintiff was guilty of laches by failing to apply for a reissue during the period of time when it must have been known to plaintiff's officers and experts, or if not actually known, the knowledge was available to them by the exercise of the smallest degree of alertness and ingenuity, that a reissue of the patent including process claims would have strengthened it. "* * * [T]he error * * * was apparent upon the face of the patent from the very day it issued. It has long been settled that due diligence must be exercised in discovering a mistake in a patent and that an unreasonable delay in making application for reissue invalidates the reissue patent." General Radio Co. v. Allen B. DuMont Laboratories, supra [129 F.2d 612].

Plaintiff permitted duPont to sell nabam for use as a fungicide and refrained from taking any action against duPont because, as witness Bergin now says, it feared that by so doing it would be misusing the patent. There would certainly be less ground to fear misuse if the plaintiff had held process claims in addition to composition claims throughout the period of its experience as a competitor of duPont.

On the question of whether or not defendant had intervening rights acquired prior to the reissue of the patent, so as to justify continued manufacture and sale of nabam as a fungicide, I conclude from the evidence that only a slight showing was made in the attempt to justify such claim by defendant; and therefore I find that defendant established no intervening rights.

Defendant has satisfied me by a preponderance of the evidence that plaintiff's reissue patent is invalid; and therefore a declaratory judgment will be entered to that effect, and plaintiff's suit will be dismissed.