## MAGMA COPPER CO. v. MINERALS SEPARATION NORTH AMERICAN CORPORATION.

Circuit Court of Appeals, First Circuit.
January 10, 1929.

No. 2259.

William H. Davis, of New York City (Merton W. Sage, of New York City, and Albert S. Woodman, of Woodman, Whitehouse, Skelton & Thompson, of Portland, Me., on the brief), for appellant.

Henry D. Williams and William Houston Kenyon, both of New York City (Sidney St. F. Thaxter, of Portland, Me., and Williams, Rich & Morse, of New York City, on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is an equity suit brought in the federal District Court for Maine by the Minerals Separation North American Corporation, a Maryland corporation, and the Minerals Separation, Limited, a British corporation of London, England, against the Magma Copper Company, a Maine corporation for infringement of letters patent No. 835,120, applied for May 29, 1905, issued November 6, 1906, to Henry Livingstone Sulman, H. F. Kirkpatrick-Picard, and John Ballot, all of London, England, and owned by the Minerals Separation, Limited; and for infringement of letters patent No. 962,678, applied for April 30, 1909, issued June 28, 1910, to Henry Livingstone Sulman, Henry Howard Greenway, and Arthur Howard Higgins, all of London, England, and owned by the Minerals Separation North American Corporation. The proceeding was begun in January, 1920. Just prior to the expiration of patent No. 835,120, by agreement of parties, the complaint with relation to that patent was dismissed, and the Minerals Separation North American Corporation was permitted to file a supplemental and amended bill of complaint for infringement of patent No. 962,678 only.

This patent is said to be for "certain new and useful improvements in ore concentration," and that its object is "to separate certain constituents of an ore such as metallic sulfids from other constituents such as gangue when the ore is suspended in a liquid such as water."

The claims in issue are Nos. 1 and 2:

"1. The hereindescribed process of concentrating ores which consist in mixing the powdered ore with water containing in solution a small quantity of a mineral-frothing agent, agitating the mixture to form a froth and separating the froth."

The second claim is identical with the first, except that the frothing agent is described as "an organic mineral-frothing agent."

The defenses here relied upon are invalidity and noninfringement; that the invalidity of these claims is due (1) to anticipation; (2) to prior invention and prior patenting in the United States; (3) to the three patentees not being joint inventors; and (4) that they are void, because they claim more than the patentees had discovered or more than they disclosed in the specification.

And as to noninfringement, the defendant asserts (1) that it does not use an acidified water or pulp to which the claims in issue must be limited by reason of the disclosure; and (2) that it does not use a process in which the froth is formed by agitation as set out in the claims. In the District Court these claims were held valid and infringed, and this appeal was taken.

In describing the process of the invention or discovery in the specification the patentees state:

"According to this invention the crushed ore is mixed with water containing in solution a small percentage of a mineral-frothing agent (that is of one or more organic substances which enable metallic sulfids to float under conditions hereinafter specified), and containing also a small percentage of a suitable acid such as sulfuric acid, and the mixture is thoroughly agitated; a gas is liberated in, generated in, or effectively introduced into the mixture and the ore particles come in

68

contact with the gas and the result is that metallic sulfid particles float to the surface in the form of a froth or scum, and can thereafter be separated by any well known means."

As a disclosure of the mineral-frothing agents used they state:

"Among the organic substances which in solution we have found suitable for use as mineral-frothing agents with certain ores are amyl acetate and other esters; phenol and its homologues; benzoic, valerianic and lactic acids; acetones and other ketones such as camphor. In some cases a mixture of two such mineral-frothing agents gives a better result than a single agent."

They also state that "the above mentioned mineral-frothing agents * * * are not intended to form an exhaustive list of suitable organic substances which may be used"; and that those above mentioned "are all more or less effective in the presence of an acid such as sulfuric acid."

They also state that "there are many organic compounds which in solution will not effect the result described," naming several, and that "a simple test is required in the case of varying ores or materials to determine which organic compound is most suitable."

As an example of one method of carrying out the invention it is further stated:

"Water containing a small percentage of sulfuric acid in solution say from .2% to 0.5%, and containing in solution a small quantity say 0.1% of one of the foregoing organic substances (say amyl acetate) is, with finely pulverized ore, introduced into an agitating apparatus, in the proportion of say 3 parts by weight of water to 1 part by weight of ore. The agitation is carried out in such a way as thoroughly to disseminate air through the mixture which is thereafter discharged into a spitzkasten. It is found that a coherent froth or scum floats on the surface of the water" and "contains a large proportion of the metallic sulfids but is substantially free from gangue"; and that "any well known means may be employed for collecting the froth."

In attempting to differentiate the mineral-frothing agents of the patent, which it discloses as being *in solution,* from the mineral-frothing agents of the prior art used in the concentration of ores, the patentees state:

"Hitherto many proposals have been made for the wet concentration of ores involving the addition to the liquid [water or acidified water] in which the ore is suspended of an immiscible liquid."

The specification then refers, for "an example" of the patentees' understanding of prior art mineral-frothing agents used in ore concentration, to the United States patent No. 777,274 issued to Cattermole, Sulman and Picard, December 13, 1904 and states that in that process "a fatty or resin acid or a phenol or a cresol" were used "by introducing the alkaline compounds of these materials into an acid liquid whereby these materials were liberated in an immiscible or insoluble condition and adhered to the mineral particles."

That process is known as the skin flotation process. Its specification discloses that the fatty or resin acids, or their derivatives cresol and phenol, are soluble compounds and that the improvement of that patent consisted in the method of thoroughly dispersing these compounds, due to their solubility, throughout the pulp in admixture with the mineral particles suspended in the ore mass; that when thus disseminated a small amount of mineral acid is added which decomposes the compound used, thus liberating the compound in intimate contact with the mineral particles which adhere thereto.

The specification then refers to another prior art flotation process, but does not specify the agent employed.

It then goes on to state that the present process differs from the two mentioned and from other known concentration processes "by the introduction into the acidified ore pulp of a small quantity of a mineral-frothing agent, i. e., an organic compound in solution of the kind above referred to and by the fact that the metalliferous particles are brought to the surface in the form of a froth or scum, not by mechanical means but by the attachment of air or other gas bubbles thereto."

In further differentiation of the present process from "frothing processes" of the prior art the patentees state:

"In the frothing processes hitherto known the substances used to secure the formation of a mineral-bearing froth has been oil or an oily liquid immiscible with water." But that,

"According to this invention the mineral-frothing agent consists of an organic compound contained in solution in the acidified water."

Later they say:

"It is well known that certain of the organic substances we have referred to [organic compounds in solution, or contained in solution] are not soluble in water in all proportions and that if used in excess [of what is soluble in water] might partly remain in-

soluble in the acidified water and might become mechanically affixed to the metalliferous particles of the ore."

Having thus pointed out that some, at least, of the organic substances referred to were not wholly soluble in water when used in all proportions, and, if used in excess of what would be dissolved in water, might partly remain insoluble even in acidified water, and become mechanically affixed to the metalliferous particles, the patentees entered a disclaimer:

"We disclaim any such use of these substances and only claim them in such amount as will enable them to dissolve in the acidified water."

It is apparent from a reading of the specification that the patentees did not undertake to name all the organic substances that would wholly dissolve in water, or all that were suitable if used only in amounts which would wholly dissolve in the water used, but did name as such agents amyl acetate and other esters; phenol and its homologues (of which cresol is one); benzoic, valerianic, and lactic acids; acetones and other ketones such as camphor; and in substance stated that the use of these substances wholly in solution was not disclosed or known in the prior art frothing processes; that in those processes the only substances known or used were an oil, or oily liquid, that was *immiscible* in water; that the use of substances wholly dissolved in water were not disclosed or known to coat or become mechanically affixed to metalliferous matter; that prior art uses and disclosures were limited to frothing agents that coat or become mechanically affixed to metalliferous matter; and that such agents are only those that are wholly immiscible in water. But in this case (see R. vol. 1, pp. 492, 503) and elsewhere the plaintiffs have contended for a broader construction or scope of the patent, and have claimed that organic compounds partly immiscible and partly soluble in water were within the scope of the patent, and that such use, was an infringement; and apparently they have obtained a decision to that effect in Miami Copper Co. v. Minerals Separation, Limited (C. C. A.) 244 F. 752, on the ground that the use of an oil that went in part into solution, the balance remaining immiscible, was a conjoint use of the patent in suit and of patent No. 835,120, if the immiscible part was used in a fraction of one per cent. on the ore. We do not now stop to consider the soundness of this contention and holding, for it is not directly involved in this case, although it will be considered later.

In view of the disclosure of the patent in suit, above pointed out, limiting its scope to frothing agents wholly in solution in the amounts used, the question presented by the defense of anticipation is whether in the prior patented art there are disclosed frothing agents which go wholly into solution if used in the limited amount of a fraction of one per cent. on the ore.

Among the prior art patents set up as an anticipation of the patent in suit is patent No. 835,120, above referred to as one of the patents put in issue in this case before the bill was amended. That patent, which expired in November, 1923, has been the subject of much litigation, and, while at the time it became known the art was a refined one, the advance that it made and the recognition it received were held sufficient to entitle it to be considered an invention.

In its specification it states:

"This invention relates to improvements in the concentration of ores, the object being to separate the metalliferous matter, graphite, and the like from gangue by means of oils, fatty acids, or other substances which have a preferential affinity for metalliferous matter over gangue."

The process of that patent is based on the discovery that, if one of the "oils, fatty acids or other substances," which has a preferential affinity for metalliferous matter over gangue, is added to a freely flowing pulp of finely ground ore suspended in water, in an amount less than, or a fraction of, 1 per cent. on the weight of the ore, and if the pulp is then vigorously agitated, there will be found a froth or scum which will arise to the surface, carrying with it the mineral particles.

Inasmuch as substances or agents having a preferential affinity for metalliferous matter over gangue have been known for generations, and that patent disclosed that they also possessed the quality of modifying the water so that, on being agitated, it will yield a froth or scum, they are spoken of as mineral-frothing agents. The specification of that patent does not differentiate between the oils, fatty acids, or other substances having a preferential affinity for metalliferous matter in the sense that they are soluble or insoluble, or in part soluble and in part insoluble, and the terms miscible and immiscible, soluble or insoluble, are nowhere mentioned in the specification or claims of the patent. The specification and claims, however, speak of the mineral particles being "oil-coated," or as having been brought into "efficient contact with" the oil or agent used.

On account of this the plaintiffs contend

70

that the frothing agents disclosed in that patent (No. 835,120) are immiscible; and that only immiscible agents will coat or be brought into efficient contact with the mineral particles. While some of them are undoubtedly substantially insoluble or immiscible, others are substantially soluble, or partly immiscible and partly soluble; and the disclosure of the patent by the use of the terms "oils, fatty acids, or other substances having a preferential affinity for metalliferous matter over gangue," does not differentiate between them as frothing agents or point out any which, if used in the limited amount of the patent (a fraction of 1 per cent. on the ore), will not coat the mineral particles. On the contrary, the specification and claims clearly give one undertaking to practice the process of the patent to understand that any or all of them will coat the mineral particles.

In Minerals Separation, Limited, v. Butte & Superior Mining Co., 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019, the Supreme Court had under consideration the scope of patent No. 835,120. The claims then in issue called for the use of an "oil," an "oily liquid," or an "oily substance." These terms were held to include, as some of the frothing agents of the process, oleic acid; petrol or gasoline; petroleum products, such as kerosene and fuel oil; and pine oil. The defendant in its alleged infringing process used as a frothing agent a compound made up of 18 per cent. of pine oil, 12 per cent. of kerosene, and 70 per cent. of fuel oil. The percentage of pine oil on the ore used by it was $^{27}/_{100}$ of 1 per cent., or a fraction of 1 per cent. on the ore, the critical amount of the patent. At that time the plaintiffs contended that the agent pine oil, which according to the evidence in this case is 79 per cent. soluble, was the only efficient agent used, and that fuel oil and kerosene, which are substantially immiscible, were "inert and valueless, if not harmful." The question to be decided was whether "the use of a *more* efficient, in combination with a less efficient, oil of the patent, constituted infringement, where the former is used in an amount within the limits of the claims but the combined amount is in excess of such limit."

In the Butte Case the Supreme Court pointed out that in a former case involving the same patent (Minerals Separation Limited v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286) it had considered "the invention and usefulness of the claimed discovery," and in doing so had reviewed the state of the art, but "did not attempt, to define the scope of the claims." Butte Case, page 341 of 250

U. S. (39 S. Ct. 497). And, having prefaced its discussion with the further statement that the patentees had come late into a field where the art was largely developed and that their patent "must be construed strictly," though fairly, it said:

"With the state of the prior art in mind [for that see Hyde Case], we come to consider the nature and extent of the disclosures of the patent in suit [No. 835,120], but only with respect to the *kinds* and *quantities of oil* which may be used in the process.

"The specification recites that the invention of the patent relates to an 'improvement' upon prior processes employed in ore concentration 'by means of oils, fatty acids, or other substances which have a preferential affinity for metalliferous matter over gangue.' "

The court then points out the specific disclosures of the specification and claims intended to describe the advance which the patentees claimed to have made over the prior art Cattermole (No. 777,273) agglomeration of metalliferous matter into granules, which separate from the gangue and sink to the bottom of the pulp. Having done this it says:

"The patent in suit was applied for in this country on May 29, 1905, within a few weeks after the discovery which it embodies was made, and * * * this discussion of its terms makes it clear, that the only disclosure as to the *kind* and *amount of oil* which the patentees made to the public as necessary to the practicing of their process is that it must be an oil or oily substance, or oily liquid having a 'preferential affinity for metalliferous matter,' and that it shall be limited in amount 'to a fraction of one per cent. on the ore.' "

In other words, it was there held that the patentees of No. 835,120 were not, by the terms of their patent, limited as to the kind of oil, oily liquid, or oily substance to the use of a kind that was immiscible, or partly immiscible and partly dissolvable; that the only limitation was that it should have a preferential affinity for metalliferous matter.

The court then takes up the plaintiffs' argument, based upon the provision of the claims, that the pulp mixture shall be agitated "until the oil-coated mineral matter forms into a froth," as serving "to differentiate the 'frothing oils' from others having the required preferential affinity, * * * but which, when agitated in the mixtures, may not produce the characteristic froth [immiscible, if such there are], and that a proper construction of the patent limits it to such frothing

oils [oils soluble in whole or in part] and renders the use of them in a fraction of 1 per cent. on the ore an infringement, when used with non-frothing oils [immiscible, if such there are] having the required affinity in amounts sufficient to make the combination exceed the quantity limit of the patent." In answer to this argument of the plaintiffs the court said:

"To give such a construction to the patent would subordinate the clear description contained in it of what are oils of the process, to an implied and vague description and classification which would leave the whole subject again at large, to become a field for further experimentation, without definition in the patent of what oils or froths would satisfy it. So interpreted the patent could not reasonably be said to contain a disclosure of the discovered process in the 'full, clear, concise, and exact terms' required by law (Rev. Stats. § 4888 [35 USCA § 33]) and the claims might conceivably be said to fall short of 'particularly pointing out and distinctly claiming' any discovery at all within the meaning of the act of Congress."

This holding is a complete refutation of the statement in the patent in suit (No. 962,-678), where it says that the frothing agents of the prior art are only such as are immiscible in water, to wit:

"In the frothing processes hitherto known the substances used to secure the formation of a mineral-bearing froth has been oil or an oily liquid immiscible with water."

It is not only a refutation of this statement of the patent in suit but an affirmation of the proposition that "oils, fatty acids, or other substances which have a preferential affinity for metalliferous matter over gangue," whether immiscible or soluble, or partly immiscible and partly soluble, are frothing agents within the meaning of the disclosure of patent No. 835,120, which is a disclosure of the art prior to the patent in suit.

Among the oils, fatty acids, and other substances having the preferential affinity referred to in patent No. 835,120, are the tar products of the Cattermole prior art patent No. 777,273, and the fatty and resin acids and their derivatives, cresols and phenols referred to in the Cattermole prior art patent No. 777,274, all of which substances have a preferential affinity for metalliferous matter over gangue.

Amyl acetate, known in commerce as banana oil, and amyl alcohol commonly known as fusel oil, both of which are specifically mentioned as mineral-frothing agents in the patent in suit (No. 962,678), have a preferential affinity for metalliferous matter, and are undoubtedly oils of the prior art. Amyl acetate is soluble in water in the proportions used of a fraction of 1 per cent. on the ore. Valerianic acid is a soluble mineral-frothing agent specifically named in the patent in suit, and is a fatty acid of the prior art patents Nos. 835,120, and 777,274. Benzoic acid is also one of the soluble mineral-frothing agents specifically mentioned in the patent in suit. It has a preferential affinity for metalliferous matter over gangue, and is therefore included within the terms referred to in patent No. 835,120 as "other substances," and is also included among the resin acids of Cattermole 777,274. Phenol and cresol named or referred to as soluble mineral-frothing agents in the patent in suit are specifically named in the prior art patent of Cattermole 777,274, and are among the oils or oily liquids of patent No. 835,120.

Phenol being among the oils or oily liquids of patent No. 835,120, and that patent having disclosed that, by reducing the quantity used to a fraction of 1 per cent. on the weight of the ore and by vigorously agitating the pulp, the agent would effect the process of that patent, it is apparent that a clear disclosure anticipating the patent in suit is shown, for phenol in the quantity used in the process of that patent is wholly dissolved in water.

This construction of patent No. 835,120 is confirmed by the disclosure in the New Zealand patent No. 19,633 of October 27, 1905, which corresponds to the United States patent No. 835,120, and was granted to the same persons for the same invention. That patent was applied for June 27, 1905; and the language used in the first three pages of the specification is practically the same as in No. 835,120. On the fourth page of the patent (R. vol. 3, p. 189) it is stated:

"Another feature of this invention consists in the method of producing and utilizing the fatty or resin acids or certain other aromatic derivatives (such as cresols, phenols, etc.)."

The next four paragraphs deal with what is known as the granulation process of the Cattermole patent, in which the agent used is in the proportion of 1 to 4 per cent. of the ore; but in the succeeding fifth paragraph this New Zealand froth agitation patent states:

"If, however the proportion of fatty acids be less than 1 % of the ore a greater or less proportion of the *coated* metalliferous matter will form into a froth as described at the beginning of this specification."

The words "fatty acids," as used in that paragraph, refer back to the group of fatty acids and their derivatives cresol and phenol previously mentioned, and plainly disclose that phenol is one of the frothing agents described in, and made a part of, patent No. 835,120; and, if used in the fraction of 1 per cent. on the ore, the critical amount of the patent, the metalliferous matter will be coated and the froth formed.

The New Zealand patent, like the United States patent, does not undertake to limit the kind of frothing agent used to one that is immiscible in water, and nowhere makes use of the term.

Then again, the disclosure of these two prior art patents—that agents having a preferential affinity for metalliferous matter coat the mineral particles with a slight film —is supported by the adsorption theory presented in evidence through defendant's witness Taggart, that such agents, though in solution, will attach themselves to, and slightly coat, the mineral particles.

The plaintiffs undertook to refute the disclosure of the New Zealand and the United States patents—that a soluble agent would coat the metalliferous particles, and on agitation produce a froth or scum—by an experiment which they made; but the experiment amounted to nothing in the absence of the deduction drawn therefrom by the plaintiffs' expert witness, which deduction was contradicted and substantially refuted by the testimony of the defendant's witness.

As stated by the defendant's witness, there is nothing mysterious about the dissemination of immiscible, or soluble, agents in water. "It is just a question of the size of the particles into which the material that is added to the water is broken. If they are extremely small, so small that you cannot see them, then it is solution. If they are larger, it is not solution. * * * In the case of the oleic acid we have particles there that are so fine that you cannot see them and we have other particles up and up to a size big enough to have been seen, if we had had clear water. When [in plaintiffs' experiments] they put that concentrate containing a lot of these particles of oleic acid that were not in solution onto the filter (which is just like a screen) those big particles of oleic acid would not go through the filter, and they were held back with the big particles of solid matter. Then, when that mixture was put back into the machine, those particles of oleic acid that had been held back went right ahead and functioned as they had in the first case, but they had not come off the mineral par-

ticles. They were there dispersed throughout the liquid. Now, when you put the phenol mixture on [the filter], the phenol particles were all dispersed so fine that they would go through the screen, so they went through. And there was still the phenol on the mineral particles, but as I testified before, that phenol that was on the mineral particles is held there so tight that when the mineral particles with it on are put back in the water there is none of it that comes off into the water to cause the frothing, to cause the stabilization of the bubbles that is necessary for the production of froth."

Furthermore, a study of the testimony in the case and the reason of the thing have convinced us that oleic acid (the agent specifically named in patent No. 835,120, and declared to be immiscible in the patent in suit, and all the mineral-frothing agents that have been used in these processes, in the limited amount prescribed of a fraction of 1 per cent. on the ore, are soluble to some extent, because you cannot get froth flotation unless there is present a constituent soluble to an extent sufficient to produce the requisite froth or scum, and the fact that oleic acid, when so used, produces the requisite froth or scum.

In the Miami Copper Case, supra, the litigation involved both patent No. 835,120 and the patent here in suit, No. 962,678. The agent employed by the defendant in its infringing process was partly soluble and partly insoluble, and the use of such an agent in a fraction of 1 per cent. on the ore was held to infringe both patents on the ground that it was a conjoint use of both. While such use was plainly within the scope of the disclosure of the first patent (No. 835,120) and an infringement of it, it was not within the scope and an infringement of the second patent, for, even assuming that the second patent is valid, its scope, as previously pointed out, is limited to the use of an agent that is wholly in solution in water. This being so, the use of the agent there employed was not within the scope and an infringement of the second patent. We therefore decline to follow the decision in the Miami Case.

For the reasons above given we are of the opinion that the claims of the patent here in question are invalid, and that the decree of the court below must be vacated.

The decree of the District Court is vacated, and the case is remanded to that court, with directions to enter a decree dismissing the plaintiff's bill with costs.

ANDERSON, Circuit Judge, concurs in the result.