JOSEPH H. MEYER BROS. et al. v. PAIS-
PEARL PRODUCTS, Inc.

PAISPEARL PRODUCTS, Inc., v. JOSEPH
H. MEYER BROS. et al.

Nos. 2741, 2742.

Circuit Court of Appeals, First Circuit.
Dec. 29, 1932.

As Modified on Denial of Rehearing Jan. 30,
1933.

Samuel E. Darby, Jr., of New York City (Samuel E. Darby and Darby & Darby, all of New York City, on the brief), for Meyer Bros. and others.

John F. Neary, of New York City (Robert Hale, of Portland, Me., and Theodore E. Simonton, of New York City, on the brief), for Paispearl Products, Inc.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is a suit for infringement of Letters Patent No. 1,525,317 applied for August 10, 1921, and issued February 3, 1925, to Jean Paisseau; and Letters Patent No. 1,760,771, applied for February 29, 1925, and issued May 27, 1930, to said Paisseau. The patents are now owned by the Paispearl Products, Inc., the plaintiff. The issues are validity and infringement. In the first patent, the claims in issue are Nos. 1, 2, 4, and 5, and in the second Nos. 1 and 2.

In the District Court the first patent was held valid and the four claims to have been infringed. The second patent was held invalid, as being anticipated.

Both patents relate to a method or processes of separating pearl essence, an industry two hundred and fifty years or more old. Pearl essence is composed of tiny crystals of an organic matter known as guanin, ordinarily obtained from the inner membrane of the scales and skin of certain fish. The crystals of guanin are separated from the membrane of the fish by certain methods, and, when so separated and collected, constitute what is called pearl essence, which is used largely in the manufacture of artificial pearls by coating glass beads with the essence, thereby imparting to them a beautiful lustre.

A preliminary and important question for decision is the nature of the process or processes disclosed in the specification of the first patent and claimed in its claims. The discussion of this question is rendered difficult due to the fact that the statements in the specification are so lacking in consecutive arrangement and thought that even the voluminous briefs of counsel have lent little aid in the solution of the question.

In the specification it is pointed out that the process employed for hundreds of years in the removal of the guanin crystals from the protoplasm or epidermis in which they are inclosed is based upon the use "of a 1 to 5% ammoniacal water"; that this process was susceptible of producing desirable results, especially in the scales of fresh water fish, and that in the practice of this process churning and stirring, or kneading the scales by hand, was employed to detach the film containing the crystals from the scales and skin of the fish. It is also there stated that the process of treatment in ammoniacal water in the cold state is slow, often taking weeks if not months, and that the quality of the product by that process can only be improved after a series of repeated washings and settlings; that it is the alkaline bath that finally disassociates or removes the fatty film in which the crystals are embedded, and permits the final separation of the crystals through repeated washing and settling stages to which they are subjected.

It is evident that the chief advance which the patentee thought he had made was the saving of time; that he could do in a few hours by the use of his process what took weeks or more with the old ammoniacal process, for he states that the process "which constitutes the object of my invention consists in principle in the rapid separation of the crystalloids from the various material containing the same—not only from the scales of fresh water fish but likewise from all parts

of any kind of fish either fresh water or sea water, from insects, or the like—by dissolving, destroying and removing the protoplasm which surrounds the said crystalloids"; that "the protoplasm may be destroyed by submitting the same to the action of all suitable chemical substances which have no action upon the crystalloids," and by making use, if desired, of heat, churning, grinding, or the like; that the "raw material may be submitted to the action of various detersive substances susceptible of dissolving or dissociating the protoplasm, the fatty substances or the like which constitute the material enclosing the said crystalloids."

Having dissolved, destroyed, and removed the protoplasm or film by agents possessing such qualities, the patentee points out that the crystalloids are then separated from the liquid "either by physical means such as settling or by mechanical means such as centrifugal treatment, or the like"; and that "by this process the crystalloids may be separated in a few hours from the raw material employed, such crystalloids being well cleaned off and constituting a pearl essence of an attractive quality." He further points out that the process above outlined may also be used "for the refining of pearl essence which has been prepared by the usual method [the ammoniacal method], and in this case the refining process will now become extremely rapid. * * * "

Among the detersive substances available for this process he names neutral soap and saponine. He further states that "identical results are obtained by the use of all bodies possessing detersive properties similar to those of soap and saponine, or containing these latter, and not susceptible of acting upon the brilliant pigments."

Having outlined his process, when starting with the raw material, he then gives two examples of how his process may be used in purifying "crude pearl essence, or sediment of 24 hours standing, prepared according to the usual [ammoniacal] method." In the first example given he names neutral soap as the reagent, and in the second saponine. In each example he gives the number of liters of crude essence, the number of grams of soap or saponine, and the number of liters of distilled water. In both of these examples the feature emphasized is that the water used in the bath where soap is used should be heated to from 35 to 60 degrees C. from two to three hours; and where saponine is used, the water should be heated to a like range of temperatures for three hours, and in both cases, during the

heating process, the mixture should be stirred. Further on the patentee states: "An excellent result is obtained by a hot treatment of the scales, for instance from 35° to 65° C. in 10 per cent. solution of soap or a 1 to 5 per cent. solution of saponine, or even a 2 per cent. carbonate of ammonia solution."

The patentee not only points out that the use of the old ammoniacal process in the cold state is slow, but that, when applied to herring scales, the churning of such scales "in the cold state with ammonia or with the carbonate, the brilliant film which covers the scale is entirely detached therefrom, and the brilliant pigment imbedded in the film is not released," as it would be from bleak fish, and that "the ammonia exerts a rapid destructive action upon this essence"—the crystals.

It is apparent from what the patentee states in his specification that in effect he disclaims the use of ammonia or carbonate of ammonia, in the cold state, as an agent of his invention, and it is equally plain that in a heated state, at least within the range of 35° to 65° C. he claims its carbonate as a reagent possessing the properties essential to the operation of his process and on an equal basis as to the excellent result to be obtained with that of soap or saponine, when similarly heated.

It is also evident, if the disclosures of the patentee be true, that, if ammonia or carbonate of ammonia in solution in the cold state operates but slowly in removing the crystals and when heated operates expeditiously in removing them, the heat is but an accelerator of the method of operation and does not alter the method by which such reagent separates and removes the protoplasm from the crystals.

It is thus apparent from the disclosure that ammonia water in separating or cleaning the crystals operates to dissolve and take into solution the fatty matter constituting the film or protoplasm surrounding the crystals, and this facilitates, through repeated washings and settlings, the separation of the crystals from the protoplasm. This is a detersive or cleansing process, but of the solution and washing type, and corresponds specifically to the mode of operation disclosed by the patentee as accomplished by his reagents, namely, "by dissolving, destroying and removing the protoplasm," or, as he otherwise states it, "susceptible of dissolving, or dissociating the protoplasm, the fatty substances or the like which constitute the material inclosing the crystals."

In reading the disclosures of the patent one would be led to believe that the agents soap and saponine, which, among others, the patentee specifically points out as detersive agents of his process, would operate "by dissolving, destroying and removing the protoplasm which surrounds the said crystals," the same as above pointed out in the case of ammonia water, for there is no other mode of operation disclosed in the specification. But in the evidence it is stated by the plaintiff's expert that the specific mode of operation of soap and saponine is not that of taking fatty substances into solution, as specifically disclosed, but of emulsification of the fatty substances or particles and holding the refuse in suspension. This is undoubtedly a detersive or cleansing mode of separation, as is the ammonia mode. They both clean and remove the substance or substances desired to be removed from the crystals so that they may be separated out of the mass in a clean state.

A further distinction, according to the specific disclosures of the specification, between soap and saponine on the one hand and ammonia or carbonate of ammonia on the other, is that soap and saponine are declared "to have no action upon the crystalloids," while ammonia is declared to "exert a rapid destructive action upon this essence"—the crystalloids.

It is thus quite apparent that one skilled in the art in endeavoring to ascertain the scope and limits of the patent by reading the disclosures there made would be led to believe that the method or mode of operation of soap or saponine was by "dissolving, destroying and removing the protoplasm which surrounds said crystalloids." The patentee, one undoubtedly skilled in the art, there so declares and he is presumed to have had special knowledge of the mode and manner of the operation of his reagents, which he names, upon the character of the matter embodied in the film or protoplasm upon which they are to operate. It was, therefore, the duty of the patentee under the law fully, clearly, and correctly to state the mode and manner of the operation of his reagents so that one skilled in the art might, on inspection of the patent and without experimentation, learn its scope and breadth; and, the patentee having failed to do so, the question is, Is the patent valid and, if so, what is its scope?

Claims 1 and 4 of the patent are the broadest of the claims. Claim 2 is also broad, but less so than claims 1 and 4, as it is limited by the introduction of the element of heat. The distinction between claims 1 and 4 resides in the fact that in claim 1 the matter upon which the reagent acts is described as the "raw material," whereas in claim 4 the matter treated by the reagent is "all the silvery parts of the bodies of fish." The phrase "raw material," as the specification discloses, includes not only the scales but "all parts of any kind of fish either fresh water or sea water, from insects, or the like"—thereby including the bladders and skin of such fish as well as the scales. In other words the raw material of which treatment is contemplated in claim 1 includes that from insects in addition to claim 4, which undoubtedly includes the scales, bladders, and teguments or skin of fish as its subject-matter of treatment. In all other respects claims 1 and 4 are alike. Claim 1 reads as follows:

"1. A process of preparation of pearl essence comprising in treating the raw material containing the brilliant crystalloids with a reagent which is susceptible of rapidly removing the protoplasm wherein the said crystalloids are imbedded, after which the crystalloids thus set free are separated from the said reagent before being acted upon by the latter."

As the first claim does not contain the element of heat embodied in claim 2, it is evident that the reagent contemplated by the first claim is one which, in the cold state, is susceptible of rapidly removing the protoplasm in which the crystalloids are embedded, and that it be one that is susceptible of acting upon the crystalloids, if any effect is to be given to the last part of this claim, which states that the crystalloids are to be "separated from the reagent before being acted upon by it." Although no such reagent is disclosed in the specification, unless it be heated ammonia or its carbonate, the file wrapper of the patent shows that the specification as originally filed named ferments, such as pancreatin, pepsine, papain, and the like, as reagents of the patent possessing the characteristic qualities of claim 1, and that claim 1 was then couched in the same broad terms as it is now, which probably accounts for its terminology and apparent lack of applicability to soap and saponine. For the specification expressly states that soap and saponine, though rapid removers, are not susceptible of action upon the crystalloids. This being so, one skilled in the art would not learn from inspection of the patent that either soap or saponine was contemplated by this claim.

Further proof that claim 1 contemplates the use of a reagent which may exert a "destructive action upon the crystals," and not

such a reagent as soap or saponine, which the specification states is "not susceptible of action upon" them, is shown by claim 5, where saponine is specifically named as a reagent for perfecting the removal of the crystalloids from an impure mass which, by other reagents, has already been brought to a state where the crystalloids have been set "free partially," for in that claim, where saponine is expressly named, the removal of the crystalloids from the reagent "before being acted upon by the latter" is not called for.

Then again, if the statement in the specification—that ammonia or carbonate of ammonia, in the cold state, acts slowly upon the matter to be treated,—is to be taken at its face value, neither of them is susceptible of rapidly removing the protoplasm within the terms of claim 1 although either will act upon and attack the crystalloids as contemplated in that claim, for the specification states that ammonia "exerts a rapid destructive action upon the essence," the crystalloids. One skilled in the art would therefore conclude upon an inspection of the patent that ammonia or carbonate of ammonia was not a reagent contemplated by claim 1 and that no reagent was disclosed in the patent answering its requirements.

The phrases "rapidly removing" and "rapid separation," as used in the claim and the specification, are no doubt employed as relative terms and evidently mean that a more rapid removal or separation is effected by soap and saponine than by ammonia in a cold state. This assertion of more rapid removal for soap and saponine, over ammonia or carbonate of ammonia, may be mere puffing on the part of the patentee. Counsel for the plaintiff assert that the patentee resorted to puffing in his specification and, if he was puffing in asserting the greater rapidity for soap and saponine over ammonia or carbonate of ammonia, one skilled in the art could not learn this from an inspection of the patent, and conclude that ammonia or its carbonate were reagents of the claim. The most plausible argument that the patentee was puffing as to this, so far as the specification discloses, is where he states that: "An excellent result is obtained by a hot treatment of the scales, for instance from 35° to 65° C. in a 10 per cent. solution of soap and a 1 to 5 per cent. solution of saponine, or even a 2 per cent. carbonate of ammonia solution." If a carbonate of ammonia solution with a given degree of heat will work rapidly and give an excellent result comparable with a solution of soap or of saponine with a like degree of heat, it would seem that, as you go down the scale and approach the cold state with any of these reagents, a like degree of rapidity would be manifest and that the claim of greater rapidity for soap and saponine over ammonia or carbonate of ammonia, in the cold state, would indicate puffing.

What we have said as to claim 1 applies with equal force to claims 2 and 4.

In view of the broad and indefinite language of claims 1, 2, and 4 and its apparent inapplicability to soap and saponine, as above pointed out, we are of the opinion that it reasonably cannot and should not be so modified and changed by construction as to cover soap and saponine as reagents and, when so considered, these claims are not infringed.

This leaves but one other claim under this patent to be considered, claim 5. This claim reads as follows:

"5. A process of preparation of pearl essence consisting in treating the raw material containing the brilliant crystalloids with reagents suitable for setting free partially the crystalloids of the organic material in which they are incorporated and then heating this impure mass of crystalloids with saponine, at a temperature of about 35° to 65° C. for three hours, after which the crystalloids thus set free are separated by settling."

It will be noted that this claim involves three steps, the first step being a treatment of the raw material with reagents for "setting free partially" the crystalloids; the second the heating of the impure mass with saponine at a temperature of from 35° to 65° C., for three hours; and the third being that of separating the crystalloids by settling. The reagents of the first step are those suitable for "setting free partially" the crystalloids. The second is a refining step of the crude essence or "impure mass" in which the crystalloids have been partially set free by the first step.

The only reagents disclosed in the specification for partially setting free the crystalloids are "any suitable solvent for fatty substances * * * which are susceptible of being dissolved in said solvent." In other words, the first step of claim 5 is nothing more than the first step called for by claim 6, which claim is not here in issue. There is no evidence to warrant a finding that the defendants have infringed this claim.

The defendants have not infringed this claim by the use of "tec," for the evidence discloses, and plaintiff's counsel admitted at the argument, that "tec" was neither soap nor saponine; and the evidence does not warrant a finding of infringement by the use of

a "solvent of fatty substances," and of saponine for three hours.

### Second Patent.

In this patent, after stating that "in current practice, pearl essence is purified by repeated washings with an antiseptic water which is generally ammoniacal water" and pointing out that this method required a long time, is attended with some risk in the way of fermentations and that, in some cases, the impurities, which consist of mud and sludge or even rust, will settle at the same rate as the pearl essence and render the method ineffective, the patentee says: "My invention relates to a purifying process by which the above-mentioned inconveniences may be obviated and an absolutely pure pearl essence may be obtained within a few minutes"; that "the process is based upon the fact that the crystalloids forming pearl essence, which are hardly moistened by water, have on the contrary a great affinity for numerous substances which are not miscible with water (or scarcely so), whereas the organic or inorganic impurities in the pearl essence will form a sludge which readily absorbs water." He then says that, if pearl essence in "aqueous emulsion" (suspension) is agitated with a certain quantity of amyl acetate, "the crystalloids will pass into the amyl acetate while the impurities remain in the water, and when allowed to stand there will be formed two layers of liquid, i. e., a layer of water which is more or less cloudy and contains the impurities, and a layer of amyl acetate containing the brilliant particles of the pearl essence." He then states: "Other bodies will act in the same manner as amyl acetate. These belong to the class of bodies which are not miscible with water, such as fatty substances, hydrocarbons of the aromatic series, petroleum and gasoline, chlorine compounds, ether, carbon disulphide and the like." He says, however, that this method of purification of pearl essence when suspended in solution "is difficult to carry out in practice, at least on a manufacturing scale, since the liquid, when added to the water, will often form a permanent emulsion which renders the separation difficult and the washing incomplete."

The method of purification of pearl essence when suspended in water by adding thereto a liquid "not miscible in water (or scarcely so)" is apparently not the process of the patent, for the patentee further states: "A more regular and reliable method consists in employing a pearl essence in the pasty condition, this being obtained by settling and by a centrifugal treatment. I incorporate into this paste by the proper mixing, a sufficient quantity of the selected substance, for instance amyl acetate; this will afford an emulsion resembling a stiff cream, and it then becomes dissociated by the separation of the water which draws with it the impurities; the purified pearl essence thus remains incorporated with the amyl acetate. But even this method will fail in certain cases, and the water may not always separate from the emulsion, this being due to an excessive fluidity of the amyl acetate and of the paste which it forms with the pearl essence"—the crystals. To remedy this he increases "the consistency of the liquid chosen" and, if that be amyl acetate, "by dissolving nitrocellulose in this solvent," thus forming a collodion or lacquer. He then states that the crystalloids "have the same affinity for this collodion as for a pure amyl acetate and, after the elimination of the water, they form with the same [the amyl acetate collodion or lacquer] a thickened paste easy to manipulate."

In carrying out this process he says that he places 500 grams of pearl essence "in the form of an aqueous paste" in a receptacle, that he adds thereto 250 to 500 grams of amyl acetate, depending upon the water content of the paste, and also 8 to 14 per cent. of nitrocellulose; that he mixes the same with a spatula or otherwise; that the crystals become incorporated in the amyl acetate mixture; that soon small drops of soiled water ooze from the paste which resolves itself into small lumps as the stirring continues; that in this condition the paste resembles butter at the beginning of its formation in the churn; that the water with the impurities is eliminated through a sieve; that the paste is then placed in a vessel containing a suitable quantity of clean ammoniacal water and, by stirring, the impurities are eliminated; that thereafter the washing operation is repeated until the water issues in a sufficiently clear condition; and that the pearl essence comes out a thick paste, practically dehydrated, and miscible without difficulty with lacquers and cellulose varnishes, the solvents of which are immiscible in water and which are employed in securing the pearl essence to the outer surface of glass beads, etc.; and, terming the amyl acetate combined with the nitrocellulose a "product," the patentee states: "The success of the operation depends solely upon the consistency and the viscosity of the product in use and upon the affinity which the crystalloids of the pearl essence have for the said product."

The patent has three claims, but only the first two are in issue. They read:

"1. A process for purifying pearl essence which consists in agitating pearl essence in a prepared and purified aqueous suspension, in bringing the pearl essence to the state of an aqueous paste, in adding to the said paste in small quantities and while mixing a liquid which is not miscible with water, capable of moistening the particles of pearl essence and of forming with the same a new paste the muddy water of which separates spontaneously, and in washing this new paste by mixing the same with water until the latter after having carried along the impurities contained in this paste flows out in a pure state.

"2. A process for purifying pearl essence consisting in agitating pearl essence in a prepared and purified aqueous suspension, in bringing the pearl essence to the state of an aqueous paste, in adding to this paste a varnish the solvent of which is not miscible with water, this addition being made in sufficiently small quantities so that the emulsion resulting from the mixture of the said paste and of the said varnish can be spontaneously destroyed in liberating the pure water originally incorporated with the paste of pearl essence, the said paste being subsequently washed with water."

The first step in each of these claims is old. It consists of nothing more than agitating pearl essence paste in a prepared and purified aqueous suspension of distilled or ammoniacal water and bringing the pearl essence thus suspended again to a state of aqueous paste. The second step of the first claim consists in adding to the aqueous paste, in small quantities while mixing, a liquid not miscible with water capable of wetting the crystalloids (such a liquid having a preferential affinity for them), and forming with the crystalloids a new paste. The affinity of the liquid for the crystalloids, to wit: Its wetting quality for them over water and dirt, operates to exclude spontaneously the water and, with it, the dirt from the mass of crystals and to render the crystals free or substantially free from water, though wetted by the immiscible liquid.

The second step of the second claim differs from the second step of the first claim only in that nitrocellulose is added to the immiscible liquid of the first claim to increase its consistency and viscosity.

The third step of both claims is nothing but the old step of washing out the dirt with water, which has been done in the purification of pearl essence for generations. It is not contended and cannot be that the affinity or preferential wetting of the guanin crystalloids by an immiscible liquid was not old.

Mr. Taylor in his early experimentations in 1919 and 1920 discloses the preferential wetting of guanin crystals by an immiscible liquid, ether, which is one of the liquids specified in the patent as capable of acting "in the same manner as amyl acetate." The same principle of nature, with reference to guanin crystals, is also shown in patents of the prior art here pleaded. See, also, Magma Copper Co. v. Minerals Separation North American Corp. (C. C. A.) 30 F.(2d) 67, 71, where amyl acetate and other so-called immiscible liquids are shown to have a preferential affinity for metaliferous matter over water and dirt. Id., 280 U. S. 400, 50 S. Ct. 185, 74 L. Ed. 511.

It is true that Taylor in his work applied such a liquid, ether, to the guanin crystals in suspension in water, while in the patent in suit the immiscible liquid is applied directly to the guanin crystals in an aqueous paste, but the prior art, in the LeRoy French patent of addition, No. 20,268 (defendants' Exhibit Z—1) shows the introduction of amyl acetate, the consistency and viscosity of which is increased by the addition of nitrocellulose, directly into an aqueous paste of pearl essence. Such method of treatment of the crystals while in an aqueous paste is, therefore, old. Furthermore, the specification of the patent in suit provides that "the crystalloids of essence of pearl have the same affinity for the collodion (the amyl acetate when rendered more viscous), as for pure amyl acetate." It is the affinity of the liquid, whether mixed with nitrocellulose or not, plus its immiscible quality that substantially dehydrates the guanin crystals.

In the French LeRoy patent, which was published June 1, 1917, long prior to the effective filing date, October 3, 1924, of the second patent, the patentee points out that his collodion composition may be used directly with the pearl essence paste, without the aqueous paste having been preliminarily dehydrated. His collodion was composed of amyl acetate and nitrocellulose as a base, with a very slight addition of alcohol and ether as compared with the amount of amyl acetate. It gives the proportions of the alcohol and ether and states that the proportions are so chosen as to avoid the precipitation of the nitrocellulose. The formula given is 1 kilogram (1.05 quarts) of amyl acetate containing 20 per cent. of collodion (nitrocellulose) to which is added 16/1000 kilograms (about 16/1000 of a quart) of 95 per cent. alcohol, and 40/1000 kilograms of sulphuric ether, and states that, in the application of the amyl

acetate collodion, the "pearl essence, decanted from the aqueous layer under which it is always kept, is taken with a spatula and incorporated in the above collodion mixture," and that "the resulting product can immediately be applied to the desired object"— meaning, undoubtedly, to the outer surface of glass beads.

There is no evidence in this case disputing the disclosure that the resulting product of the patent is substantially dehydrated and can immediately be applied to the desired object. And it cannot be said that this patent does not disclose a liquid immiscible with water capable of dehydrating the aqueous paste or that it does not disclose the direct application of the liquid to pearl essence in an aqueous paste and not to crystals when in suspension; also that, if the liquid is too fluid, it may be rendered more consistent and viscous by the addition of nitrocellulose, the same as pointed out in the patent in suit for increasing its consistency and viscosity when the liquid (amyl acetate) is too fluid.

The patent in suit provides that the collodion shall contain 8 to 14 per cent. of nitrocellulose to give the necessary consistency and viscosity, and says that "the success of the operation depends solely upon the consistency and viscosity of the product in use [the amyl acetate collodion] and upon the affinity which the crystalloids of the pearl essence have for the said product" (the collodion liquid), while the LeRoy patent provides for the consistency and viscosity of the liquid by adding 20 per cent. of collodion (nitrocellulose).

All the plaintiff says of the LeRoy patent is that the quantity of alcohol (about 16/1000 of a quart) employed in the French patent is such as to render the one quart or more of amyl acetate and nitrocellulose (the lacquer of that patent) miscible with the water of the paste, but it produces no evidence to this effect and we cannot regard it as so on the mere statement of counsel without evidence, in view of the explicit statement in the patent that its product can be immediately applied to the desired object, clearly meaning that it has been dehydrated so that it may be applied; and of the well recognized fact that amyl acetate, when used in a substantial quantity, is not miscible with water, but when used in a small amount is miscible. Magma Copper Co. v. Minerals Separation North American Corp. (C. C. A.) 30 F.(2d) 67;

and cases there cited; Id., 280 U. S. 400, 50 S. Ct. 185, 74 L. Ed. 511.

As all the steps in the claims were old, we do not think it was invention to join them together in a given sequence. The washing with water, with distilled water, or with ammoniacal water, to eliminate dirt, was old. The preferential wetting of guanin crystals by immiscible liquids having a preferential affinity for them, was old. The direct application of such a liquid to an aqueous paste of guanin crystals was old and the rendering of the immiscible liquid more concentrated and viscous, by the addition of nitrocellulose, was old. The only thing disclosed in the patent not shown in the prior art is washing the paste after the crystals composing it had been enclosed (wetted) by the immiscible liquid. But this we do not regard as invention or as anything more than one skilled in the art would have done, if he regarded additional washing desirable.

As to the first patent the decree of the District Court is reversed. As to the second patent the decree of the District Court is affirmed. In No. 2741 the appellants recover costs. In No. 2742 the appellees recover costs.

MORTON, Circuit Judge (concurring).

I concur in the conclusions reached by my brother BINGHAM. I desire to add, however, that the claims in suit of the first Paisseau patent seem to me clearly void for indefiniteness and lack of invention. Paisseau did not invent any new process for making pearl essence. Every step of the process which he describes in his patent was old when he entered the field; and the combinations of separate steps contained in the claims were old. What he did, if he did anything, was to discover a new reagent for one of the steps, viz., soap or saponine in place of ammonia or its salts. If the word "rapidly" is struck out of the first claim, it reads on the old ammonia process. It is in effect a claim to an old unpatentable process, only changed by the additional stipulation that the reagent used shall be one which will accomplish the desired result "rapidly." No discussion is necessary I think to show that such a claim is not good. In Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868, much more definite claims in a pioneer chemical patent were held invalid. See, too, O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601. The other claims in suit stand no better than the first.