### EARNSHAW KNITTING CO. v. WILLIAM CARTER CO.
#### No. 3680.

District Court, D. Massachusetts.
Jan. 31, 1935.

Francis J. V. Dakin and James D. Colt, both of Boston, Mass., for plaintiff.

Emery, Booth, Varney & Townsend, Frederick L. Emery, and Irving U. Townsend, all of Boston, Mass., for defendant.

BREWSTER, District Judge.

In this suit infringement of United States letters patent No. 1,852,993 is alleged. The defendant attacks the validity of the patent on the sole ground of lack of invention. It also denies infringement.

### Statement of Facts.

1. On April 5, 1932, United States letters patent No. 1,852,993 were issued to the plaintiff as assignee of George F. Earnshaw upon his application filed January 16, 1928. The invention relates to an infant's garment commonly known as a "play suit." Its principal object is to provide a garment suitable for use as a play, romping, or bathing suit which exposes the body of the child to the air and sun so far as consistent with the dictates of modesty.

2. Four claims are involved. It will be sufficient to give the first claim, which is stated in the following terms: "1. A play suit including a trunk portion, a pair of shoulder straps, each secured at one end to the said trunk portion at the waist line and adjacent one side thereof and at its other end to the back of the trunk portion, said straps diverging downwardly at the front, a neck portion connecting the straps at the front thereof near their shoulder engaging portions, and a front shield or panel filling in the space between said straps, neck portion and trunk portion, said shield or panel being of a mesh formation sufficiently close to conceal the front upper portion of the body from view and yet leave the same exposed to the influence of sun light."

The second claim embraces an additional element, namely, a fastening strap, secured to the back portion of one of the shoulder straps, and means for detachably securing the free end to the other shoulder strap.

The third and fourth claims differ from the first claim only by adding that the area not covered by the front panel and straps shall be completely (claim 3) or substantially (claim 4) open to leave the body exposed.

3. The elements, or features, common to all the claims are: A trunk portion; a pair of shoulder straps, each secured at one end to the trunk portion at the waist line and adjacent one side thereof and at its other end to the back of the trunk portion, said straps diverging downwardly at the front; a neck portion connecting the straps at the front thereof near their shoulder engaging portions; and a front shield or panel filling in the space between said straps, neck portion and trunk portion, said shield or panel being of a mesh formation sufficiently close to conceal the front upper portion of the body from view and yet leave the same exposed to the influence of sunlight.

4. The history of the proceedings in the Patent Office is pertinent. In the original application, five claims were made which were rejected on cited patents, whereupon these claims were canceled and claims 6, 7, 8, and 9 were filed covering the same invention. Of these four claims, claim No. 9 was allowed, the others rejected, and another reference to prior patents was noted. Applicant then filed another claim as No. 10, and amended claims 8 and 9.

The next Office action was a rejection of all the claims other than claim 9. This was followed by a communication from the applicant's solicitor under date of June 5, canceling claims 6, 7, and 10, amending claim 8, and adding a new claim as claim 11. At the same time, he submitted to the patent officials affidavits showing the sales that had been made between January, 1928, and June, 1929, of the garment disclosed in the application. In this letter the solicitor particularly stressed as novel features, patentably distinguishable from the prior art, the shoulder straps secured at each end to the trunk portion at the waist line thereof, a front shield or panel separated by said shoulder straps and neck portion "substantially free from trunk supporting strain and being of a mesh formation sufficiently close to conceal the front upper portion of the body from view and yet leave the same exposed to the influence of sunlight"; the other areas between the straps above the trunk portion being completely open to leave the body of the wearer above the trunk portion fully exposed except for said straps, neck portion, and front panel. And, of course,

the solicitor laid particular emphasis upon the extraordinary commercial success of the garment.

Shortly after receipt of this communication, claims 8, 9, and 11 were allowed, and interference was declared between these claims and three claims taken from an application for a patent filed by one Redmond, an employee of the defendant. These interference proceedings were finally determined in favor of Earnshaw. In the meantime he had moved to add three additional claims, of which claim 12 was added as the fourth count in the interference proceedings. This claim covered the invention in somewhat broader terms than any of the other claims. During the course of the interference proceedings motions to dissolve, with supporting affidavits, were filed by Redmond. The ground alleged was want of patentable invention in all counts. The Examiner of Interference refused to entertain the motions, and his decision was upheld by the Board of Appeals. The interference proceedings were terminated on March 4, 1932, and the patent issued, as stated, on April 5, 1932.

5. Within the last two decades the effect of ultra violet rays upon the human body has engaged the attention of medical science. By 1925, physicians, nurses, and teachers were unanimous in proclaiming the benefits of sun rays directly upon the bodies of children, especially in the earlier years. In that year, the director of the Child-Hygiene Division in the Department of Agriculture pointed out in a published article that the value of sunlight for the treatment of children's diseases had been recognized since 1903 when Rollier opened his first clinic for heliotherapy in Switzerland.

In 1926, 1927, and 1928 the Home Economic Bureau issued bulletins in which information was disseminated relative to the beneficial effect of sun baths for children, and in these bulletins various types of rompers were illustrated, some of which were made of fabric more or less transparent. These bulletins and the activities of the Bureau contributed to the creation of a demand in the trade for garments for children's wear which would leave as much of the body exposed to sunlight as could be attained without offending the dictates of modesty.

6. In order to deal with defendant's contention that the patent in suit did not involve invention, it is necessary to consider the state of the art when Earnshaw entered it in May, 1927.

The first to enter the field seems to have been Jantzen Knitting Mills of Portland, Ore., manufacturer of swimming suits. In 1926, this company manufactured and sold in small quantities bathing suits for small children which they advertised under the name of "sun suits." They were the conventional one-piece swimming suit with abbreviated trunks, no sleeves, low neck and with holes under the arms. They were modeled after the "speed suits," so called, manufactured by the company which had for its principal object greater freedom of movement by the swimmer when in the water. The company discontinued manufacturing these suits in 1927 because it found that the line was unprofitable.

During 1926 and 1927, government employees in the Bureau of Home Economics made and demonstrated certain styles of play suits, or rompers, which exposed to the sun generous portions of the infant's body. These had both a front and back panel with short straps buttoning on the shoulder. Some of them were made of semi-transparent material, such as voile. These garments were only used for illustrative purposes.

Evidence was offered regarding a product put on the market by another manufacturer of swimming suits, the Swim Easy Knitting Mills Company. The evidence is conflicting and does not come up to the required degree of proof necessary to enable the court to determine whether this product was before or after Earnshaw's invention. It is not unreasonable to infer that later types of the garments manufactured and sold by this concern imitated, rather than anticipated, Earnshaw.

A third manufacturer of swimming suits, the Climax Company, in the latter part of 1927 introduced into the trade a swimming suit which was advertised as a sun suit for children. There is evidence in this case tending to show that this concern had benefited by Earnshaw's work.

It does not appear that any of these attempts to supply the demand for sun suits succeeded in making any substantial impression upon the art. It is, moreover, significant that during the interference proceedings the activities of the Home Economics Bureau and these various manufacturers of knitted one-piece swimming suits were urged upon the Examiner in support of the motion to dissolve the interference referred to in paragraph 4. The Examiner was of the opinion that: "It is not apparent that it would lack invention to cut away all but

the front panel, shoulder strips and neck portion and to substitute open mesh fabric in the front panel for the particular purpose of the present invention." He further observed that: "Assuming that the separate details of the counts as stated therein are old, it is not apparent that their adaptation and combination into a garment answering the counts is obvious or suggested."

7. Earnshaw's entrance into the art came about in this way. While in California in the spring of 1927, he visited a nursery school where he was advised of the increasing demand for sun suits for children, and immediately upon his return to plaintiff's factory he set about devising a play suit which he thought might fill the needs. His first garments were not satisfactory, but in the summer of 1927 he produced a sun suit similar to the patented one, except that the panel was of closely woven fabric. These garments were put on the market in substantial quantities and will be referred to as the "unpatented suit." During this development Earnshaw conceived the idea of improving the "unpatented suit" by using in the panel a mesh, or other loosely woven material, and prepared to manufacture and put on the market the patented suit; and after January, 1928, only the patented play suit was manufactured and sold. Earnshaw's work was carried on wholly independent of the activities of the other knitting companies and of the Home Economics Bureau.

8. As already stated, plaintiff began to manufacture in quantities the unpatented sun suit in June, 1927, and during that year it manufactured, sold, and advertised only suits like the unpatented type. Nearly 30,-000 garments were sold during 1927 under the trade-name of "Vanta Sun-Suit." After 1927, the manufacture of this garment was discontinued, and in the year 1928 over 270,-000 garments of the patented type were sold under the same trade-name. The monthly sales ranged from 204 in January to over 8,-200 in June. In 1929, 420,516 of the patented garments were sold. The highest monthly sale was 137,772 in June, 1929. The extent of the sales of the 1928 garment was brought to the attention of the Patent Office in affidavits. The affidavits, however, contained no reference to the sales in 1927 of the unpatented sun suit.

9. The plaintiff introduced the unpatented garment to the trade through its salesmen who solicited orders, and through posters and cards distributed to the retail trade, but no direct advertising went to the ultimate consumer until 1928, when the patented garment was advertised in periodicals having nation-wide circulation, such as the Ladies Home Journal, Good Housekeeping and other similar publications. The earliest of these publications was in May, 1928. Naturally, the advertising and the efforts of plaintiff's sales organization contributed, to a substantial degree, to the commercial success of the patented sun suit, but the advertisements were of such a nature that they would not negative the idea of merit in the garments advertised. They merely called to the attention of the public the fact that the plaintiff was manufacturing and producing a sun suit which obviously met the requirements of the times.

10. There was a period of over two and one-half years between the allowing of three claims of Earnshaw's application and the final grant of the patent. This delay was due principally to the efforts of the defendant to appropriate or to defeat the patent. During this period the defendant manufactured and sold sun suits in substantial quantities. These sales would have constituted infringement had the patent been then issued. When the patent did finally issue, defendant had a quantity of infringing garments on hand. 1,000 of these were ostensibly sold to Selfridge & Co., London, apparently in the belief that the defendant could thereby escape the charge of infringement. The negotiations were carried on between the defendant's New York representative and William M. Carr & Co., agent for foreign buyers. The defendant offered the suits at $1.75 per dozen which, after some delay and after the rejection by defendant of counter offers, was finally accepted. The goods were invoiced and delivered to Carr & Co., and Carr & Co. paid for them. It is not proved by convincing evidence that any of these goods ever reached Selfridge. It was established, however, that many of them found their way into department stores in Massachusetts, New York, and California.

### Conclusions of Law.

The defendant assails the validity of the patent on the single ground that Earnshaw's contribution to the art called for the exercise only of ordinary mechanical skill, and did not involve invention within the purview of the patent law.

■ The patent has been granted after extended consideration of prior patents, of affidavits showing commercial success, and of evidence adduced in interference proceedings. This action of the officials, charged

with the duty of granting a legal monopoly only to applicants who present a patentable invention, carries a presumption of validity. Radio Corp. v. Radio Engineering Laboratories, 293 U. S. 1, 54 S. Ct. 752, 755, 55 S. Ct. 66, 78 L. Ed. 1453, 79 L. Ed. ——. In this recent case, the court recognized the presumption of validity arising from a patent regularly issued. While that case involved facts quite different from those in the instant case, there is language in the opinion which seems to have a general application. During the course of his opinion, Mr. Justice Cardozo observed: "Through all the verbal variances, however, there runs this common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance."

■ That this presumption obtains when the defense is want of invention, seems to be settled. Kirchberger v. American Acetylene Burner Co. (C. C. A.) 128 F. 599; Parker v. Stebler (C. C. A.) 177 F. 210; Permutit Co. v. Harvey Laundry Co. (C. C. A.) 279 F. 713; Alliance Securities Co. v. J. A. Mohr & Son (D. C.) 14 F.(2d) 793, 799.

■ This presumption is aided by evidence of commercial success. If doubt exists upon the issue of invention, such commercial success will often turn the scale in favor of validity. The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Wiler), 143 U. S. 275, 12 S. Ct. 450, 36 L. Ed. 154; Atlantic, Gulf & Pacific Co. v. Wood (C. C. A.) 288 F. 148; Frick Co. v. Lindsay (C. C. A.) 27 F.(2d) 59.

This is especially so if the article patented possesses the characteristics of novelty and utility. The Barbed Wire Patent, supra; Minerals Separation, Ltd. v. Hyde, 242 U. S. 261, 270, 37 S. Ct. 82, 61 L. Ed. 286; Trane Co. v. Nash Engineering Co. (C. C. A.) 25 F.(2d) 267; Frick Co. v. Lindsay, supra; Apco-Mossberg Corp. v. Trico Products Corp. (C. C. A.) 45 F.(2d) 594, 598; Sheridan et al. v. Silver-Brown Co. (D. C.) 4 F. Supp. 759, 761.

■ Earnshaw's sun suit constituted a novel combination. Defendant admits its inability to produce from the patented or practical art any garment which anticipated plaintiff's patent. Its utility must also be conceded. This is demonstrated by the energy displayed by defendant in delaying and attempting to defeat the patent in suit,

as well as by its activity in manufacturing and selling garments similar to the patented garment while the proceedings were thus being delayed.

The garment was an immediate success commercially because it satisfied an obvious demand created, not so much by plaintiff's advertising as by the dissemination of knowledge respecting the benefits to be derived from the direct action of the sun's rays on the human body. Earnshaw met this demand by providing a suit for children's wear which exposed to the sun the maximum of the body consistent with modesty. He was the first to enter the trade with play suits, as distinguished from abbreviated rompers or one-piece bathing suits.

As I have earlier pointed out, the commercial success undoubtedly was increased by the advertising and sales efforts, but I conclude that these factors do not exclude the idea of merit in the patented article. This is not a case where the extent and method of advertising created a demand for a patentable device irrespective of its merits. Obviously there was a rapidly growing demand for such a play suit, and, by means of the advertising, the public was advised where the demand could be supplied. Defendant contends that the demand was not "a long-felt want," but this contention does not carry conviction. The demand was more than a passing fad. The need of such sun suits must have existed for several years prior to 1928. For at least two years the Bureau of Home Economics had been stressing the value of play suits for infants which would admit sunlight to the body, and for over a decade the beneficial effect of direct sun rays had engaged the attention of physicians, nurses, and mothers, especially as a means for promoting the health of the child.

I am unable to see any reason for denying to plaintiff the full force of the presumption of validity arising from the grant. On the contrary, that presumption is aided by the novelty, utility, and popular reception of the patented article, and by its evident ability to satisfy a real need.

It is my opinion that the presumption is further strengthened, rather than weakened, by the evidence before me of commercial success. But if we were to attribute the commercial success principally to salesmanship and effective advertising, the presumption of validity would not be overcome. It would simply be left without the support which ordinarily would be derived from evidence of popularity of the patented article.

The controlling issue presented is whether there are other considerations which will overcome the presumption of validity, fortified as it is by the factors above noted.

Novelty, utility, or commercial success does not entitle one to monopolize the subject-matter of the patent if there is no original conception. Burt v. Evory, 133 U. S. 349, 358, 10 S. Ct. 394, 33 L. Ed. 647; Hill v. Wooster, 132 U. S. 693, 10 S. Ct. 228, 33 L. Ed. 502.

In Smith v. Nichols, 21 Wall. 112, 118, 22 L. Ed. 566, Mr. Justice Swayne said: "A patentable invention is a mental result. It must be new and shown to be of practical utility. Everything within the domain of the conception belongs to him who conceived it. The machine, process, or product is but its material reflex and embodiment. A new idea may be ingrafted upon an old invention, be distinct from the conception which preceded it, and be an improvement. In such case it is patentable."

See, also, Burt v. Evory, supra.

In the recent case of United States v. Dubilier Condenser Corp., 289 U. S. 178, at page 188, 53 S. Ct. 554, 557, 77 L. Ed. 1114, 85 A. L. R. 1488, Mr. Justice Roberts has defined the act of invention as follows: "It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form."

Earnshaw's patent cannot be classed as a pioneer patent although he carried his ideas into a new field when he conceived a new play suit. Rompers, made partly of transparent material, were known. One-piece bathing suits for children and adults had been produced of closely woven fabric, but in none of these was the construction and material such as to accomplish the avowed object of plaintiff's patent. The mesh panel alone would not be adequate to show invention. It would mean only the substituting of one material for another; but the prior art showed no play suit that could be said to anticipate. The patented art, cited by the Patent Examiner and by the defendant at the trial, only shows some element or elements of the claim. None showed all the elements of the same combination. The same is true of the practical art. The particular construction of the garment and the open material of the front panel, the complete or partial exposure of the areas of the body not covered by the trunk portion, panel and straps, taken together, constitute a mental concept which might well have impressed the Patent Office.

Conceding that Earnshaw made no startling or revolutionary contribution, I have not been persuaded that the Examiner of Interference was wrong when he said that it was not apparent that it would lack invention to cut away all of the front panel, shoulder straps, and neck portion, and to substitute open mesh fabric in the front panel for the particular purpose of the present invention.

I have reached the conclusion, therefore, that the presumption of validity should obtain in this case, and that the defense of non-invention cannot prevail.

On the question of infringement, the facts recited in the tenth paragraph of the above statement of facts entitle the plaintiff to an injunction. Whether, and to what extent, the sale of the 1,000 suits, which was made after the patent issued, amounted to an infringement need not be determined at this stage of the proceedings. The question may never arise if the plaintiff should be content with the establishment of the validity of the patent in suit without proceeding further.

A form of decree may be entered establishing the validity of the patent and enjoining infringement and for other appropriate relief in accordance with the prayers; the form of decree to be submitted to the court for approval.